# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA
# ANDERSON/GREENWOOD DIVISION

| | |
|---|---|
| Wilbert Finley, )<br> )<br> )<br>    Plaintiff, )<br> )<br>v. )<br> )<br>Kraft Heinz, Inc., )<br> )<br> )<br>    Defendant. )<br>_____) | Civil Action No. 8:22-cv-426-TMC<br><br>**ORDER** |

Plaintiff Wilbert Finley commenced this action against Defendant Kraft Heinz, Inc., his former employer, asserting claims for (1) discharging Plaintiff in retaliation for protected activity under the Food Safety Modernization Act ("FSMA"), *see* 21 U.S.C. § 399d, and (2) wrongful discharge in violation of public policy under South Carolina common law. (ECF No. 1). In accordance with 28 U.S.C. § 636(b)(1)(A) and Local Civil Rule 73.02(B)(2)(g) (D.S.C.), this matter was referred to a magistrate judge for all pretrial proceedings. Defendant subsequently filed a Rule 12(b)(6) motion to dismiss Plaintiff's second cause of action for wrongful discharge in violation of public policy. (ECF No. 13). On February 13, 2023, the court entered an order adopting the magistrate judge's recommendation (ECF No. 34) and granting Defendant's motion to dismiss Plaintiff's claim for wrongful discharge in violation of public policy. (ECF No. 49).

Defendant then filed a motion for summary judgment as to Plaintiff's remaining claim that Defendant discharged him in violation of the FSMA. (ECF No. 50). Now before the court is the Report and Recommendation (the "Report") of the magistrate judge, recommending that the court grant Defendant's motion for summary judgment. (ECF No. 70). Plaintiff filed objections to the

Report, (ECF No. 78), and Defendant submitted a reply to Plaintiff's objections, (ECF No. 82). The court concludes that the issues have been adequately developed for purposes of this motion and that a hearing is unnecessary for the court to issue a ruling. Local Civil Rule 7.08 (D.S.C.).

**Background**

Plaintiff worked as a production manager for Defendant at its plant in Newberry, South Carolina, which "processes a variety of deli meats, including turkey bacon," with a workforce of approximately 1,400 employees. (ECF No. 66-21 at 2). Prior to his employment with Defendant, Plaintiff had extensive work experience in food safety for the Kellogg Company and Proctor and Gamble. *Id*. Defendant assigned Plaintiff to its Bacon and Rigid Departments.[1] Plaintiff's duties included:

> ▪ Ensuring product quality and food safety by following Defendant's quality standards, "Good Manufacturing Practices (GMPs), standard operating procedures (SOPs), and product specifications." Plaintiff suggests he encountered resistance in performing this task.
>
> ▪ "Organizing and facilitating production line activities . . . to achieve conformance with . . . requirements regarding quality, safety, employee relations, and productivity." According to Plaintiff, he often was forced to perform these duties "with insufficient resources and staff."
>
> ▪ "Reporting to [Plaintiff's] supervisor quality defects and helping to determine necessary corrective actions . . . to eliminate repetitive failure."
>
> ▪ "[O]verseeing the development of teams using the very limited resources available for coaching, training, and engagement, and coping with the high turnover and absenteeism of the demoralized workforce."
>
> ▪ Assisting in the supervision of production staff and assisting in performance management and employee development.

*Id*. at 3.

Defendant maintained a plant handbook setting forth Defendant's "policies, procedures, standards, and expectations for its employees" including "the Plant's Food Defense Policy" which

---

[1] The term "rigid" merely refers to meat products packaged in rigid plastic packaging. (ECF No. 66-21 at 2).

explains Defendant's "stance on food safety and helps prevent, deter, identify, and respond to potential food safety concerns" and "prohibits retaliation against employees that raise food safety concerns." (ECF No. 50-5 at 2–3). The handbook specifically directs any employee who "suspect[s] that there has been a violation of this policy" to "immediately report the [violation to] . . . [the] department head; your Security Director; Human Resources; your Kraft Heinz Company local counsel; Compliance & Integrity department." *Id*. at 8. New employees are trained on the Company's "Good Manufacturing Practices" ("GMPs"), *id*. at 3, which authorizes "[a]ll personnel . . . to stop a [production] line if a possible contaminant is identified," (ECF No. 50-2 at 82).

<u>Plaintiff's Food Safety Concerns</u>

Defendant's Bacon Department "engages in continuous monitoring to detect and eliminate the presence of bone in the turkey bacon meat." (ECF No. 50-3 at 3). "Prior to 2019, the Plant used metal detectors and visual inspections to detect the presence of bone or foreign substances in the turkey bacon meat," and, in late 2019, added x-ray machines to help detect the presence of bone and/or other foreign materials. *Id*. According to Defendant's Quality Manager at the Newberry plant, Janice Ball ("Ball"), "whenever hard bone larger than 3/8 of an inch, which is known as the 'burst limit,' is detected in the turkey bacon-by way of visual inspection, metal detection, or x-ray detection-production employees must immediately stop running the line and contact the Quality Department for further instruction." *Id*. The Quality Department puts a hold on the product in question and conducts an investigation, following which workers in the Bacon Department might conduct online sampling, destructive sampling, or send the product to "rework" or "offal." *Id*. at 3–4. Online sampling involves pulling sample slabs of bacon off the line at prescribed intervals for full inspection for the presence of bone. (ECF No. 50-2 at 117–18). Destructive sampling requires the opening and visual inspection of 900 packages of bacon. *Id*. at

117. A "rework" means essentially eliminating any bone fragments and re-processing the bacon to create a new finished slab for packaging. *Id*. at 118. And, finally, the Quality Department might determine the best course is to send the fouled product to "offal"—*i.e*., have it completely discarded. (ECF No. 50-3 at 4).

In the summer of 2019, Plaintiff began regularly voicing concerns to production managers and HR that significant staffing shortfalls had the potential to impact food safety. (ECF No. 66-21 at 10–11). Specifically, Plaintiff complained on a "weekly or even daily basis" that "(a) line supervisors were having to work the bacon line to meet the minimum head count, in which case, they then could not fully perform supervision; (b) not all employees were trained on x-ray use; and (3) shortage or lack of trained 'Blast Attendants' directly threaten[ed] safety." *Id*. at 11. Plaintiff was concerned that the effect of inadequate staffing was to violate FDCA standards, contending that:

> Less than optimal or full staffing is not in itself illegal, but when non-electronic human surveillance is a key food safety protocol then short staffing-- leaving not enough eyes on the product passing by on the conveyor line-- does violate the law because, for example, the leakers will threaten food contamination and adulterants such as bone will be sold to consumers. More problematic is the certification, training, qualification and experience levels of the available employees, not just a roster count.

*Id*.

Also, beginning around mid-February 2020, Plaintiff began reporting his concerns to supervisors that even with the new x-ray machines, the quality control process was failing to address bone fragments in the bacon. *Id*. at 11–12. Plaintiff also complained that the x-ray machines were not being used properly and had not been properly calibrated and that the Quality Department had failed to ensure that employees were properly trained on use of the x-ray machines. (ECF No. 1 at 4–5). Plaintiff was very persistent in raising his safety concerns, and

other employees at the plant were aware of his complaints. According to Marquis Glanton ("Glanton"), a supervisor at the plant, he went with Plaintiff to "tell Quality that there were too many bones in the meat to safely run [the production line]." (ECF No. 66-24). Glanton shared Plaintiff's belief that "[t]he safety culture at the Kraft Heinz Newberry Plant [was] not good," and indicated "[e]mployees fear and expect to be fired if they push food safety issues [and] I shared that fear." *Id*. Cumeico Debrick ("Debrick"), an area production manager for Defendant, similarly "supported [Plaintiff's] food safety concerns" but "was scared to escalate them further." (ECF No. 66-7).

<u>Termination of Hourly Workers Gaines and Subsequent Termination of Plaintiff</u>

On March 12, 2020, Plaintiff and Bobby Clark ("Clark"), bacon production supervisor under Plaintiff, were supposed to terminate Ms. Gaines, an hourly worker, for excessive absences. (ECF No. 50-2 at 99, 141). When Gaines failed to appear for work that day, however, they were unable to do so. *Id*. Nonetheless, according to Myah Perry ("Perry"), employed by Defendant as an HR generalist, Plaintiff went ahead and submitted to HR the termination paperwork for Gaines indicating that Plaintiff had walked Gaines out of the building on March 12. *Id*. at 151. Both Plaintiff and Clark signed the termination paperwork. (ECF No. 50-4 at 4). Defendant's HR Department subsequently attempted to inform Gaines of her right to have a Management Attendance Review prior to formal termination but was unsuccessful. Accordingly, HR officially terminated Gains' employment on March 23, 2020, and deactivated her identification badge.

On March 24, 2020, Gaines appeared for work. When she discovered her employee identification badge was not operational, she reported to HR and explained to Perry that she had not been walked out of the building on March 12 and, in fact, had been reporting to work regularly since that time. (ECF No. 50-2 at 139–140). Perry then investigated the incident. Clark confirmed

5

Gaines was not walked out of the building on March 12, as she never reported for work that day. Clark told Perry that, on March 12, he informed Plaintiff that he (Clark) would be on vacation the following day, and that Plaintiff would have to inform Gaines of her employment termination and walk her out of the building. *Id*. When Perry talked to Plaintiff, however, Plaintiff told her multiple times that he had walked Gaines out of the building. *Id*. Perry also reported the situation to Joshua Harp ("Harp"), Plaintiff's direct supervisor and the plant manager for the Ready-to-Eat Division; HR Manager Kathryn Longerbeam ("Longerbeam"); and HR Manager Lauwana Wilson ("Wilson"), recounting her conversations with Clark and Plaintiff. *Id*.

Wilson and Harp also questioned Plaintiff and Clark about the incident. Clark repeated to Wilson what he had stated to Perry – that Gaines had not been at work on March 12, and that he had suggested to Plaintiff that, since Clark was taking going on vacation, Plaintiff terminate and walk Gaines out if she appeared for work on March 13. *Id*. at 142. In contrast to his conversation with Perry, Plaintiff told Wilson that he had not walked Gaines out because she had not been at work. *Id*. at 141. During the same conversation, however, Plaintiff stated that "[Gaines] showed up at work and that [Clark] walked her out." *Id*. Then, according to HR's report, in a second conversation with Harp and Wilson, Plaintiff indicated that he prepared the termination forms but Clark, not Plaintiff, had walked out the terminated employees. *Id*. at 142. Using his cellphone, Plaintiff recorded this second conversation with Harp and Wilson and submitted a transcript of the recording in opposition to Defendant's motion for summary judgment. (ECF No. 66-23). The transcript shows that Plaintiff indicated multiple times that he did not know who submitted Gaines' termination forms and denied that ever stating that he had walked Gaines out. *Id*. at 6–7.

Wilson found that Plaintiff had made inconsistent statements during the investigation of how Gaines' termination was handled and concluded that Plaintiff was being dishonest in violation

6

of the code of conduct set forth in Defendant's Plant Employee Handbook (doc. 50-2, Wilson dep. 121:19-122:11 & ex. 4). Specifically, the Handbook states: "Conduct that will result in corrective action and could result in immediate suspension or termination on the first offense includes, but is not limited to: . . . Dishonesty, including falsification or failing to correctly and accurately record and/or document any company or processing record, such as employment application, production records, time records, HACCP records, PM's etc. or any other company or official document." (ECF No. 50-5 at 11). Wilson recommended that Plaintiff's employment be terminated, and Longerbeam, the HR Manager, concurred. (ECF No. 50-5 at 3). Randy Puckett, the overall Plant Manager, subsequently approved the recommended action. (ECF No. 50-2 at 112).

As noted previously, as a result of his termination, Plaintiff filed this action against Defendant, alleging claims for retaliatory discharge in violation of the FSMA, *see* 21 U.S.C. § 399d, and for wrongful discharge in violation of public policy. (ECF No. 1). On February 13, 2023, the court dismissed Plaintiff's claim for wrongful discharge in violation of public policy. (ECF No. 49). Defendant then moved for summary judgment as to Plaintiff's only remaining claim for FSMA retaliation. (ECF No. 50).

## FSMA

The following provisions of the FSMA are relevant here:

(a) No entity engaged in the manufacture, processing, packing, transporting, distribution, reception, holding, or importation of food may discharge an employee . . . because the employee . . .

> (1) provided, caused to be provided, or is about to provide or cause to be provided to the employer, . . . information relating to any violation of, or any act or omission the employee reasonably believes to be a violation of any provision of this chapter or any order, rule, regulation, standard, or ban under this chapter, or any order, rule, regulation, standard, or ban under this chapter;
>
> . . .

>    (4) objected to, or refused to participate in, any activity, policy, practice, or assigned task that the employee (or other such person) reasonably believed to be in violation of any provision of this chapter, or any order, rule, regulation, standard, or ban under this chapter.

21 U.S.C. § 399d(a)(1), (4).

The Fourth Circuit has yet to address the elements of a retaliation claim under the FSMA, and only a handful of federal courts in any circuit have done so. The courts that have specifically considered this issue, however, have adopted the framework for analyzing a claim of retaliation under antidiscrimination laws such as Title VII "with the modification that the 'protected activity' set forth in the standard for stating a prima facie claim under the FSMA refers to activity that is explicitly protected under the FSMA as set forth in 21 U.S.C. § 399(d)." *Chase v. Bros. Int'l Food Corp.*, 3 F. Supp. 3d 49, 54 (W.D.N.Y. 2014)[2]; *see Brown v. Choice Prod., LLC*, No. 20-cv-046-WMC, 2021 WL 5038759, at *8 (W.D. Wis. Oct. 27, 2021) (considering "similar retaliation claims for guidance, including those arising under Title VII, the ADA and the ADEA"). The magistrate judge took this approach in the Report, (ECF No. 70 at 13), and the parties did not object to this portion of the Report. The court agrees and adopts this framework as well.

To survive summary judgment on his FSMA retaliation claim, therefore, Plaintiff "must present direct evidence that: (1) [ ]he engaged in statutorily protected activity; (2) [ ]he suffered an adverse employment action; and (3) there is a causal connection between the two." *Brown*, 2021 WL 5038759, at *8 (internal quotation marks omitted). Assuming Plaintiff "makes this prima facie showing, . . . [Defendant] bears the burden of offering a nondiscriminatory explanation

---

[2] "[P]rotected activity under the FSMA includes, but is not limited to, providing information to an employer about conduct that the employee 'reasonably believes to be a violation of any provision' of the FSMA, or objecting to or failing to participate in any conduct that the employee 'reasonably believed' was in violation of the FSMA." *Chase*, 3 F. Supp. 3d at 54 (citing 21 U.S.C. § 399d(a)).

8

for its decision to terminate [Plaintiff's] employment, and, thereafter, the burden would return to [Plaintiff] to show that [Defendant's] proffered explanation is pretext for [FSMA] retaliation." *Nichols v. Ashland Hosp. Corp.*, 251 F.3d 496, 502 (4th Cir. 2001) (internal quotation marks omitted); *see Brown*, 2021 WL 5038759, at *9.  As set forth below, the magistrate judge determined that Plaintiff was unable to establish a prima facie claim for retaliation and, therefore, that Defendant was entitled to summary judgment.

### The Magistrate Judge's Report

Assuming for the sake of analysis that Plaintiff established the first two prongs of a prima facie FSMA retaliation claim, the magistrate judge concluded that Plaintiff "failed to show the third element of a prima facie case - that a reasonable jury could conclude that his protected activity was a contributing factor in his employment termination." (ECF No. 70 at 14).  The magistrate judge recognized that "[t]emporal proximity between the protected activity and the adverse action is a significant factor in considering a circumstantial showing of causation," *id*. (citing *Feldman v. Law Enf't Assocs. Corp.*, 752 F.3d 339, 348 (4th Cir. 2014)), and acknowledged that, "[h]ere, there is undoubtedly close temporal proximity between the plaintiff's complaints and his employment termination" as his "latest complaints occurred in February 2020, and his employment was terminated in or around late March 2020," *id*. at 15.  However, the magistrate judge noted that "[t]he causal connection may be severed by the passage of a significant amount of time, or by some legitimate intervening event," *id*. at 14–15 (internal quotation marks omitted) and agreed with Defendant that "[P]laintiff's conduct during the investigation into Ms. Gaines' employment termination serves as a legitimate intervening event," *id*. at 15.  In an extended discussion of his conclusion, the magistrate judge explained:

> . . . Ms. Perry believed that the plaintiff turned in Ms. Gaines' employment termination paperwork on March 12, 2020, and walked Ms. Gaines out of the

9

building that day. However, Ms. Perry learned on March 24, 2020, that Ms. Gaines was never walked out of the building and had been reporting to work almost every day since March 12, 2020. Ms. Perry investigated the matter on the morning of March 24, 2020, and spoke with both Mr. Clark and the plaintiff. Ms. Perry documented that Mr. Clark stated that the plaintiff was supposed to walk Ms. Gaines out of the building on March 13, 2020. Although the plaintiff subsequently denied making these statements, Ms. Perry also documented that the plaintiff stated that he turned Ms. Gaines' employment termination paperwork into HR and walked Ms. Gaines out of the building on March 12, 2020. Ms. Perry then reported all of this information to Ms. Wilson, Mr. Harp, and Ms. Longerbeam on the same day. Also on March 24, 2020, Ms. Wilson followed up on Ms. Perry's investigation and spoke with both the plaintiff and Mr. Clark. Mr. Clark provided information that was consistent with what Ms. Perry had documented, but the plaintiff stated that he never walked Ms. Gaines out of the building because she was absent. Ms. Wilson documented that the plaintiff then stated that Ms. Gaines had eventually shown up to work on March 12, 2020, and Mr. Clark walked her out. Moreover, Ms. Wilson documented that the plaintiff denied telling Ms. Perry earlier that he walked Ms. Gaines out of the building. At some point that day, Ms. Sheppard was also interviewed, and Ms. Sheppard documented that Mr. Clark said that the plaintiff was supposed to walk Ms. Gaines out of the building. Later that day, Ms. Wilson and Mr. Harp continued the investigation and met with the plaintiff again. Both the investigative summary report and the transcript from the plaintiff's recording reflect that the plaintiff denied walking Ms. Gaines out on March 12, 2020. When asked if he submitted Ms. Gaines' employment termination form, he stated multiple times that he did not know. However, the plaintiff also stated, "I did not talk to that woman. I just turned it - - turned the paperwork in. I did not talk to that woman at all" (66-23 at 5). Based on the foregoing, Ms. Wilson determined that the plaintiff had been dishonest in violation of the code of conduct and recommended that his employment be terminated. Ms. Longerbeam concurred with Ms. Wilson's recommendation, and Mr. Puckett provided final approval. Based on the foregoing, the undersigned finds that the plaintiff's conduct during the defendant's investigation of Ms. Gaines' employment termination constitutes a legitimate intervening event that severed any causal connection.

*Id*. at 15–16.

The magistrate judge also found that evidence of internal instant messages between Harp and Longerbeam discussing concerns about Plaintiff's lack of honesty; the recording from Plaintiff's interview with Harp and Wilson reflecting Harp's comment that "I don't think there's any question about you didn't walk her out. . . . The question is around what things were said and whether you're being honest with us"; and evidence that Defendant had recently terminated other employees based on dishonesty or falsification all supported Defendant's assertion that it

terminated Plaintiff for lack of honesty. *Id*. at 16–17. Accordingly, the magistrate judge concluded that "no reasonable juror could conclude that the Plaintiff's complaints about food safety were a contributing factor in his employment termination." *Id*. at 16.[3]

Finally, the magistrate judge rejected Plaintiff's argument that Defendant's investigation of the Gaines incident was not reasonably thorough or credible, and, therefore, served as a mere cover for the real reason for his termination—his protected activity. *Id*. at 17–19. The magistrate judge supported this conclusion with a detailed summary of the investigation and determined that it provided no basis for the conclusion that his complaints were a contributing factor in his employment termination. *Id*. at 19. The magistrate judge also disagreed with Plaintiff that the evidence reflected he had been treated differently than other employees—specifically Clark, the security guard who allowed Gaines to enter the premises after her badge had been deactivated, and HR employees who took no action for two weeks after Gaines' termination paperwork was submitted. The magistrate judge determined that these employees were not similarly situated and did not constitute valid comparators. *Id*. at 21–22.

## Standards of Review

The recommendations set forth in the Report have no presumptive weight, and this court remains responsible for making a final determination in this matter. *Elijah v. Dunbar*, 66 F.4th 454, 459 (4th Cir. 2023) (citing *Mathews v. Weber*, 423 U.S. 261, 270–71 (1976)). The court is charged with making a *de novo* determination of those portions of the Report to which a specific objection is made, and the court may accept, reject, modify, in whole or in part, the

---

[3] The magistrate judge suggested that even if Plaintiff had established a prima facie case, he would have recommended that summary judgment still be granted on the alternative basis that Defendant "has shown by clear and convincing evidence that it would have terminated the plaintiff's employment in the absence of his complaints." (ECF No. 70 at 17 n.4).

recommendation of the magistrate judge or recommit the matter with instructions. 28 U.S.C. § 636(b)(1). Thus, "[t]o trigger de novo review, an objecting party 'must object to the finding or recommendation on that issue with sufficient specificity so as reasonably to alert the district court of the true ground for the objection.'" *Elijah*, 66 F.4th at 460 (quoting *United States v. Midgette*, 478 F.3d 616, 622 (4th Cir. 2007)). However, the court need only review for clear error "those portions which are not objected to—including those portions to which only 'general and conclusory' objections have been made[.]" *Dunlap v. TM Trucking of the Carolinas, LLC*, 288 F. Supp. 3d 654, 662 (D.S.C. 2017); *see also Elijah*, 66 F.4th at 460 (noting that "[i]f a litigant objects only generally, the district court reviews the magistrate's recommendation for clear error only"). Furthermore, "'the court is not obligated to consider new arguments raised by a party for the first time in objections to the magistrate's Report.'" *Floyd v. City of Spartanburg S.C.*, Civ. A. No. 7:20-cv-1305-TMC, 2022 WL 796819, at *9 (D.S.C. Mar. 16, 2022) (quoting *Elliott v. Oldcastle Lawn & Garden, Inc.*, No. 2:16-cv-01929-DCN, 2017 WL 1206408, at *3 (D.S.C. Mar. 31, 2017); *see also Elijah*, 66 F.4th at 460 n. 3 (noting "district court judges are not required to consider new arguments posed in objections to the magistrate's recommendation").

**Discussion**

Plaintiff filed thirty-one pages of objections to the Report. (ECF No. 78). Plaintiff's arguments can be grouped into a handful of general categories, which the court addresses herein.[4]

**1. Assertion that the Report failed to address all of Plaintiff's protected activity that was in close temporal proximity to Plaintiff's termination (ECF No. 78 at 4–5; 28–29; 31–32)**

---

[4] The court notes that the shotgun manner in which Plaintiff has organized his brief (ECF No. 76) presents a challenge to the reader. Rather than present an entire argument as to a given topic in a single section, Plaintiff scatters portions of his argument on a given issue here and there throughout the brief in a non-contiguous fashion. For example, Plaintiff challenges the magistrate judge's findings and conclusions regarding the issue of temporal proximity on pages 4–5, then again on pages 28–29, and again on pages 31–32. *See* (ECF No. 76). The court has attempted to address all of Plaintiff's arguments on a single issue together in one discrete and coherent discussion.

The magistrate judge agreed that "there is undoubtedly close temporal proximity between the plaintiff's complaints and his employment termination," specifically noting his "latest complaints occurred in February 2020, and his employment was terminated in or around late March 2020." (ECF No. 70 at 15). Plaintiff takes exception to the Report in that it did not also specifically mention Plaintiff's March 2020 complaint regarding the shortage of "Blast Attendants" as detailed in Plaintiff's Declaration filed in opposition to summary judgment. (ECF No. 78 at 4–5 n.3–4 (citing ECF No. 66-21)). In particular, Plaintiff points out that this complaint was referenced during Plaintiff's meeting with Harp and Wilson about his handling of Gaines. *Id*. at 5–6.

The court finds no basis for concluding the magistrate judge committed error on this particular ground. Assuming this constitutes protected activity, the evidence Plaintiff presents shows the complaint would have been made on March 12—the day Gaines termination paperwork was submitted to HR. (ECF No. 66-23 at 4–5). This activity occurred before Defendant's investigation of Gaines' termination; the magistrate judge's failure to expressly consider this "fact" does not reflect an error in the Report, which, in any event, credits Plaintiff with have established close temporal proximity between his protected activity and subsequent termination. Accordingly, this objection is overruled.

**2. Assertion that the Report disregarded Plaintiff's comparator evidence (ECF No. 78 at 6–10).**

Plaintiff offered evidence that, in his view, reflects that similarly situated employees were treated more favorably, which, in turn, suggests that the real reason he was terminated was in retaliation for his complaints rather than Defendant's stated reason—dishonesty. The court briefly touches on these purported comparators below.

13

Clark. Plaintiff argues that the magistrate judge ignored or improperly discounted evidence that Clark should have been disciplined for his handling of Gaines. First, according to Plaintiff, he presented evidence showing that Clark allowed Gaines to continue reporting to work for ten days after she was due to be terminated. (ECF No. 78 at 6). Citations to evidence regarding Clark are sprinkled throughout his objections, *id.* at 7–9; 11–14; 17–18 ; 21. The court has considered all of the evidence highlighted by Plaintiff in relation to this objection. Primarily, Plaintiff argues that the evidence shows Clark, not Finley, was Gaines' immediate supervisor and was responsible for walking Gaines out and handling her termination paperwork, that Clark was present at work from March 12 to March 24, and that, as Gaines' supervisor, Clark would have seen her at work each day after she was to have been terminated. (ECF No. 78 at 7–8). From this evidence, Plaintiff argues, the court should infer that over the ten workdays following March 12, Clark failed to walk Gaines out or otherwise rectify the situation by notifying HR which "would necessarily raise an issue of honesty and integrity." *Id*. at 9. Defendant did not take any disciplinary action or counsel Clark on how he should have handled the issue, which Plaintiff contends is evidence that Defendant treated a similarly dishonest employee more favorably. *Id*. at 9–10.

In reply, Defendant points out that Plaintiff was not dismissed because Gaines' termination was bungled; rather, Defendant terminated Finley because it believed he was dishonest during the investigation into the Gaines situation. (ECF No. 82 at 9–10). Defendant argues that Clark "provided consistent accounts of his involvement with Gaines' termination," and, therefore, was not viewed as dishonest during the investigation. The court agrees that this distinction precludes the use of Clark as a valid comparator. Moreover, to the extent that Plaintiff has attempted to build a case that Clark was generally dishonest in how he handled Gaines' termination, this argument was not raised until Plaintiff filed his objections and, as a result, the court need not consider it. *See*

*Jones v. Fam. Health Ctr., Inc.*, 323 F. Supp. 2d 681, 690 (D.S.C. 2003). However, even if the court were to consider this argument, it would conclude that Clark is not a valid comparator. To find that Defendant should have concluded that Clark was generally dishonest in how he handled Gaines would require the court the speculate. More importantly, this argument still misses the basis for Plaintiff's termination—Defendant concluded he lied during the investigation.

<u>HR Personnel</u>. Plaintiff points to evidence in the record showing that the paperwork for Gaines' termination was submitted to HR on March 12, 2020, and then "sat in the HR office for almost two weeks" without Gaines' access badge being deactivated and collected or any other action being taken on the matter. (ECF No. 78 at 14–15). Plaintiff argues that Defendant's failure to discipline any of the HR employees for their lapses in connection with this incident is evidence that Plaintiff was singled out based on retaliatory animus. *Id*. at 15. To the extent Plaintiff argues HR personnel serve as comparators and that the magistrate judge erroneously overlooked such comparator evidence, the court disagrees and concludes that HR personnel are not valid comparators. As the Report explains, Plaintiff has not pointed to evidence that HR employees engaged in similar dishonest conduct—indeed, Plaintiff's evidence reflects, at worst, inefficiency. As Defendant points out, uncontradicted evidence reflects that after receiving Gaines' paperwork, HR employees were required to contact Gaines for an "attendance review" before making termination official. (ECF No. 82 at 11). The evidence reflects they attempted to do so here. Defendant's HR employees are clearly not valid comparators.

<u>Security Personnel</u>. Finally, Plaintiff argues the Report disregarded the fact that Defendant did not discipline security staff for allowing Gaines access to the plant without proper badging. *Id*. at 6. The court summarily rejects this argument. The security staff is not similarly situated to Plaintiff and, in fact, is not even employed by the Defendant. Rather, security services at the plant

15

are provided by third-party contractors. Because security personnel at the plant are not employed by Defendant, they are not valid comparators for Plaintiff in this instance. *See Dinda v. CSC Gov't Sols., LLC*, No. 2:17-cv-03171-DCN-MGB, 2019 WL 4280370, at *10 (D.S.C. Mar. 21, 2019), *report and recommendation adopted*, 2019 WL 3244186 (D.S.C. July 19, 2019) (concluding individuals who worked with Plaintiff were not valid comparators because they were not employed by Defendant but instead worked for an independent contractor).

Accordingly, the court rejects Plaintiff's argument that the magistrate judge overlooked the foregoing comparator evidence and concludes this argument provides no basis for the court to disturb the magistrate judge's conclusions and recommendations. The court overrules this objection.

### 3. Adequacy of the Investigation

The magistrate judge rejected Plaintiff's argument that Defendant's investigation of how Gaines' termination was handled was slipshod and inadequate and, therefore, reflected that his "[food safety] complaints were a contributing factor in his employment termination." (ECF No. 70 at 19). Plaintiff takes issue with this conclusion, spraying references to Defendant's failure to conduct a thorough investigation throughout his brief objecting to the Report. *See* (ECF No. 78 at 6–10; 15–17; 24–25). "An employer's investigation process need not have been ideal, but its decision on the evidence adduced must have been 'reasonably informed and considered.'" *Burton v. Food Giant Supermarkets, Inc.*, No. 1:19-cv-2445-JDB-JAY, 2021 WL 3574885, at *8 (W.D. Tenn. Aug. 12, 2021). "The fact that [Defendant/employer's] investigation may not have been as thorough as [Plaintiff/employee] would have liked does not establish pretext, so long as the investigation was not 'obviously inadequate.'" *Powell v. Biscuitville, Inc.*, 858 F. App'x 631, 633 (4th Cir. 2021) (quoting *Villa v. CavaMezze Grill, LLC*, 858 F.3d 896, 905 (4th Cir. 2017)). Thus,

the employer "need not prove that [it] interviewed every person, but only that [it] made its decision to terminate [the employee] based on an honestly held belief in a nondiscriminatory reason supported by particularized facts after a reasonably thorough investigation." *Burton*, 2021 WL 3574885, at *8 (internal quotation marks omitted).

Even viewed in a light most favorable to Plaintiff, the evidence in the record would not permit a reasonable trier of fact to conclude that Defendant's investigation of Gaines' termination was "obviously inadequate." As noted by the magistrate judge, the evidence reflected that the investigation was "reasonably thorough":

> [W]hen Ms. Perry learned that Ms. Gaines had not been walked out of the building on March 12, 2020, she promptly interviewed Mr. Clark and the plaintiff that day. Ms. Perry documented the events that transpired with Ms. Gaines, as well as the content of her conversations with Mr. Clark and the plaintiff. Ms. Perry then provided that information to Ms. Wilson, Mr. Harp, and Ms. Longerbeam. Moreover, Ms. Wilson interviewed Mr. Clark, the plaintiff, and Ms. Sheppard that day. The investigation continued, and Ms. Wilson and Mr. Harp interviewed the plaintiff again on March 24, 2020. At that point, Ms. Wilson provided her recommendation that the plaintiff's employment be terminated due to dishonesty.

(ECF No. 70 at 18–19).

Plaintiff argues, however, that the magistrate judge discounted a few pieces of evidence that undercut Defendant's conclusion that Plaintiff had been dishonest and suggested the investigation was not thorough. First, Plaintiff points to the statement from Faith Sheppard, an HR administrator employed by Defendant, indicating she was present when Perry spoke with Plaintiff and Clark, that Clark stated that Plaintiff was supposed to walk Gaines out of the building because he (Clark) was not at work, and that Plaintiff stated he had deactivated Gaines' badge on Thursday March 12. (ECF No. 50-2 at 143). Sheppard also indicated that Plaintiff stated to Perry "I did that Thursday" but that she was "not sure if [Plaintiff] was talking about [deactivating] the badge or walking [Gaines] out." *Id*. Plaintiff objects to the Report because, in his view, the magistrate judge should have used Sheppard's statement to infer that HR employees Wilson, Harp, and

Longerbeam "*knew* Perry's claim that [Plaintiff] said 'he walked [Gaines] out' was unreliable." (ECF No. 78 at 21). The court concludes that this evidence does not undermine the validity of the investigation or cast doubt on Defendant's reason for terminating Plaintiff. Indeed, Wilson stated in her report that Sheppard's report "validates [Perry's] conversation that [Plaintiff] claimed being involved with [Gaines'] termination." (ECF No. 50-2 at 100). This is true, as Defendant notes, "regardless of whether [Plaintiff] was referencing deactivating Gaines' badge or walking her out. . . . [G]iven that [Plaintiff] later denied both walking Gaines out of the building and deactivating her badge, Sheppard's statement corroborates Perry's account that [Plaintiff] told Perry he did something that he later denied doing." (ECF No 82 at 14). The court rejects this argument and overrules this objection.

Second, Plaintiff objects to the Report because the magistrate judge discounted the instant message thread between Longerbeam and Harp which Plaintiff contends is evidence that the investigation was a sham, and Longerbeam, "who knew of Plaintiff's food safety concerns, was steering the outcome to termination before the investigation had even begun," (ECF No. 78 at 16):

> [Harp:] thoughts on [the plaintiff]?
>
> [Longerbeam:] my thought – you and [Ms. Wilson] talk to him today to get an understanding from him on what happened. Sounds like dishonesty – saying he walked the employee out but didn't, termed for attendance or AWOL – doesn't seem honest and upfront. Suspend pending review?
>
> [Mr. Harp:] that's what I was thinking[.]

(ECF No. 50-5 at 16). Plaintiff's preferred inference from this evidence—that Longerbeam was signaling that Plaintiff should be terminated because of his food safety complaints—is simply unreasonable. Plaintiff has not cited to any evidence in the voluminous record showing that Longerbeam knew about Plaintiff's food safety concerns—rather, there is only Longerbeam's declaration that she had no knowledge of such concerns prior to Plaintiff's termination. (ECF No. 50-5 at 4). As the magistrate judge concluded, the instant message evidence is simply additional

evidence of the reason for Plaintiff's termination—dishonesty. (ECF No. 70 at 16). Accordingly, the court rejects this argument and overrules this objection.

### 4. Consistency of Defendant's Explanation for Plaintiff's Termination

Next, Plaintiff objects (ECF No. 78 at 25) to the following determination by the magistrate judge:

> The plaintiff also argues that the defendant's reasons for terminating his employment have shifted over time (doc. 66 at 16). Specifically, the plaintiff highlights that Ms. Longerbeam indicated that the plaintiff was dishonest about "suspending" Ms. Gaines, while Ms. Wilson indicated that he was dishonest about "walking [Ms.] Gaines out" (id. at 13; doc. 50-2, Harp dep. ex. 6). However, the undersigned declines to find that this reflects the defendant shifting its reasons for the plaintiff's employment termination. As explained herein, Ms. Gaines was eligible for a MAR, and her employment termination was not officially processed until after the MAR process was complete. Accordingly, as stated by the defendant, "suspending" and "walking Ms. Gaines out" in this context appear to be interchangeable, and their varying use is immaterial here.

(ECF No. 70 at 19). Plaintiff argues that in finding these terms "interchangeable," the magistrate judge failed to view the evidence in a light most favorable to the non-moving party as required by Rule 56. (ECF No. 78 at 25). The court disagrees. These explanations clearly refer to dishonesty about the same incident; Plaintiff asks the court to parse the language in order to draw an unreasonable inference from the facts. The court declines to do so and overrules this objection.

### Conclusion

The court has carefully reviewed the briefs and documents submitted by the parties in light of the record before the court. The court has likewise carefully considered all of Plaintiff's objections to the Report, including those objections not expressly discussed herein. The court hereby **ADOPTS** the Report (ECF No. 70), incorporates it as if set forth fully herein, and finds no basis for deviating from the magistrate judge's recommended disposition of this matter. Accordingly, the court hereby **GRANTS** Defendant's Motion for Summary Judgment (ECF No. 50).

**IT IS SO ORDERED.**

                                              s/Timothy M. Cain
                                              United States District Judge

January 30, 2024
Anderson, South Carolina